# Exhibit B

| | |
|---|---|
| **STATE OF LOUISIANA** | **19th JUDICIAL DISTRICT COURT** |
| | **EAST BATON ROUGE PARISH** |
| **Versus** | **CASE NO. _____** |
| **EXPRESS SCRIPTS, INC.** | |
| **EXPRESS SCRIPTS HOLDING, INC.** | |
| **ASCENT HEALTH SERVICE, LLC** | |
| **CIGNA GROUP** | |
| **EVERNORTH HEALTH, INC.** | |
| **PRIME THERAPEUTICS, LLC** | |
| **HUMANA PHARMACY SOLUTIONS, INC.** | |
| **HUMANA, INC.** | **STATE OF LOUISIANA** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PETITION FOR DISCOVERY AND INVESTIGATION**

**NOW INTO COURT**, through undersigned counsel, comes the State of Louisiana through the Honorable Elizabeth B. Murrill, Attorney General, and respectfully submits the following Petition.

**I.      Nature of the Action**

1.      The Attorney General is the chief legal officer of the State of Louisiana pursuant to the Louisiana Constitution Article IV, Section 8. Pursuant to LSA-R.S. 13:4861, et seq., the Attorney General of the State of Louisiana may maintain a civil action for investigation to conduct discovery when a cause of action is probable against a defendant.

2.      The Defendants in this case are pharmaceutical benefit management companies (PBMs), and their parent companies or subsidiaries. This Petition details the Defendants participation in the pharmaceutical benefits management industry and how their actions abuse their market power and result in economic harm to patients and the independent pharmacies that serve them.

3.      This Petition details a combination, contract, and/or conspiracy between Defendants Express Scripts, Inc. and Express Scripts Holding, Inc. (collectively "ESI") and two of its direct competitors, Prime Therapeutics, LLC and Humana Pharmacy Solutions, LLC, to fix pharmaceutical reimbursement rates and related fees in Louisiana, in violation of the Louisiana Monopolies Act, La. R.S. 51:121, *et seq.*

4.      ESI's and its co-conspirator's practices involve aligning prices and rebates that consolidates market power and eliminates competition, by collaborating in negotiations for rebates from pharmaceutical manufacturers. This practice can lead to a situation where smaller PBMs or health plans cannot compete because they lack the volume to negotiate similarly large rebates. As

a result, manufacturers are incentivized to align their pricing strategies with the demands of large PBMs like ESI, sidelining smaller competitors.

5. The Defendant's conduct has resulted in higher drug prices for patients in Louisiana, because the rebates and discounts negotiated often lead to higher list prices for drugs, as manufacturers adjust prices to account for the concessions made to PBMs. Patients often face higher out-of-pocket costs, especially those whose copayments or coinsurance are based on the list price of drugs.

6. This Petition further details other unlawful, unfair, and anticompetitive actions committed by ESI in their dealings with independent pharmacies in Louisiana, occasioned by their abuse of their market power, and in violation of the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq.*

7. The State seeks relief in the form of orders against the Defendants to admit to facts, submit to testimony, to produce information pursuant to La. R.S. 13:4865-4875.

## II. Parties

8. Plaintiff, the State of Louisiana ("State") is a sovereign state that fulfills its duties to its citizens through various offices established by law. The Attorney General has the constitutional and statutory authority to bring this action on behalf of the State, and in the public interest of the citizens of the State of Louisiana, pursuant to La. R.S. 13:4862.

9. Defendant Express Scripts, Inc. is a corporation organized under the laws of Delaware and headquartered in Saint Louis. Express Scripts, Inc. is a subsidiary of Express Scripts Holding, Inc.

10. is a corporation organized under the laws of Delaware and headquartered in Saint Louis. The company is a subsidiary of The Cigna Group and operates under the brand name Evernorth Health Services following a rebranding in late 2020.

11. Defendant the Cigna Group is a corporation organized under the laws of Delaware and headquartered in Bloomfield, Connecticut.

12. Ascent Health Services LLC ("Ascent") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Schaffhausen, Switzerland. Ascent is engaged in the business of, inter alia, acting as a group purchasing organization for the negotiation of rebates with drug manufacturers on behalf of PBMs. Ascent's ownership includes, among others, both Defendants Express Scripts / Express Scripts Holding,

Inc. and Defendant Prime Therapeutics, LLC. Defendant Humana Pharmacy Solutions is an Ascent customer.

13. Prime Therapeutics LLC ("Prime Therapeutics") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Eagan, Minnesota. Prime Therapeutics is engaged in the business of, inter alia, providing PBM services to commercial health plans, self-insured employers, and government programs in the State of Louisiana. Prime Therapeutics is owned jointly by numerous Blue Cross and Blue Shield Plans, subsidiaries or affiliates, including, on information and belief, Louisiana Health Services Indemnity, Inc. d.b.a. "Blue Cross Blue Shield of Louisiana".

14. Humana Pharmacy Solutions, Inc. ("Humana Pharmacy Solutions") is a corporation organized and existing under the laws of Kentucky, with its principal place of business in Louisville, Kentucky. It is a subsidiary of Humana Inc. ("Humana"). Humana Pharmacy Solutions is engaged in the business of, *inter alia*, providing PBM and mail order prescription services.

15. Humana, Inc. is a Delaware corporation headquartered in Louisville, Kentucky.

### III. Jurisdiction and Venue

16. The district court has subject matter jurisdiction pursuant to La. R.S. 13:4863.

17. This Court has personal jurisdiction over the Defendants pursuant to La. C.C.P. Art. 6, La. R.S. 13:3201, 51:1287, 51:1407(A), 51:1418, and related statutes, because the Defendants engage in commercial transaction within Louisiana, and purposefully directs its action towards Louisiana, and has the requisite minimum contacts within Louisiana to permit this Court to exercise jurisdiction.

18. Venue is proper in East Baton Rouge Parish because the 19th Judicial District Court would have jurisdiction against the Defendants to grant relief in favor of the State based on the facts and law as alleged in this Petition, pursuant to La. R.S. 13:4863.

### IV. Facts

**A. The role of pharmacy benefit managers in the pharmaceutical industry is a matter of national concern.**

19. Prescription benefit managers ("PBMs") are part of complex vertically integrated health care conglomerates, and the PBM industry is highly concentrated. This vertically integrated and concentrated market structure has allowed PBMs to profit at the expense of patients and independent pharmacists.

20. On July 9, 2024, the Federal Trade Commission published a report on the prescription benefit management industry as part of ongoing inquiry into "how increasing vertical integration and concentration has enabled the six largest PBMs to manage nearly 95 percent of all prescriptions filled in the United States."[1]

21. The report stems from special orders the FTC issued in 2022, under Section 6(b) of the FTC Act, to the six largest PBMs—including the Defendants herein.[2]

22. "The FTC's interim report lays out how dominant pharmacy benefit managers can hike the cost of drugs—including overcharging patients for cancer drugs," said FTC Chair Lina M. Khan. "The report also details how PBMs can squeeze independent pharmacies that many Americans—especially those in rural communities—depend on for essential care."[3]

23. The report finds that PBMs wield enormous power over patients' ability to access and afford their prescription drugs, allowing PBMs to significantly influence what drugs are available and at what price. This can have dire consequences, with nearly 30 percent of Americans surveyed reporting rationing or even skipping doses of their prescribed medicines due to high costs, the report states. The interim report also finds that PBMs hold substantial influence over independent pharmacies by imposing unfair, arbitrary, and harmful contractual terms that can impact independent pharmacies' ability to stay in business and serve their communities.

24. On March 1, 2023, the U.S. House Committee on Oversight and Accountability Chairman James Comer launched an investigation into PBMs' role in rising health care costs, citing finding "PBMs have pushed deliberate, anticompetitive tactics, causing Americans to suffer from rising health care premiums and expensive prescription drug prices."[4]

25. On July 23, 2023, the House Oversight Committee held a hearing to "examine how PBMs have used their position as middlemen to cement anticompetitive policies which have increased prescription drug costs, hurt independent pharmacies, and harmed patient care."[5]

**B. ESI's market power and relationship with independent pharmacies in Louisiana.**

---

[1] https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-releases-interim-staff-report-prescription-drug-middlemen
[2] 15 U.S.C. § 46(b). This section grants the Federal Trade Commission (FTC) the authority to require annual or special reports from businesses to gather information about their practices.
[3] *Id.*
[4] https://oversight.house.gov/release/comer-announces-hearing-with-pbm-executives-on-role-in-rising-health-care-costs/
[5] *Id.*

26. Independent pharmacies play a crucial role in the Louisiana healthcare system by dispensing medications, compounding medications, and managing medication therapy. To serve patients that have prescription drug coverage through their health insurance, pharmacies must work through PBMs that administer prescription drug benefits on behalf of health insurers.

27. PBMs, such as ESI, function as payment processors in the distribution of prescription drugs. Six PBMs control 95% of all prescriptions filled in the nation. The "Big Three" PBMs—Express Scripts, CVS Caremark, and OptumRx—control more than 80% of the prescriptions filled in the U.S.

28. The Big Three PBMs are each owned by the largest health insurance companies in the United States: Cigna (Express Scripts), United Health (OptumRX), and Aetna/CVS Health (CVS Caremark).[6]

29. Pharmacies that are part of a PBM's Pharmacy Network purchase drugs from a Manufacturer or wholesaler, and after these drugs are dispensed to a patient, the PBM reimburses the pharmacy under the pharmacy's contract with the PBM.

30. To be able to serve their patients, i.e. to accept health insurance reimbursements rather than charge their patients cash, independent pharmacies have no choice but to contract with each of the Big Three PBMs.

31. ESI is the second largest PBM in the country and the largest PBM in Louisiana. ESI is the PBM for Blue Cross Blue Shield of Louisiana, the largest private health insurer in the state. By virtue of its size and expansive influence, ESI exercises enormous market power throughout the country and throughout Louisiana.

32. Cigna and its subsidiary Evernorth participate in their own capacities in Express Scripts' business and operations. On information and belief, Evernorth and its employees are directly involved in the sale.

33. The private (non-governmental) market for PBM services is fundamentally distinct from the state governmental (i.e., Medicaid) market, because there are distinct groups of consumers in each. That is, Louisiana citizens receiving pharmaceutical benefits through their participation in Medicaid do not participate in the private market, and therefore do not provide any pricing discipline in the private market. The converse is also true: Louisiana citizens receiving pharmaceutical benefits through private insurance do not participate in (or provide any potential

---

[6] CVS Health Corporation owns both the health insurer, Aetna, and its PBM, CVS Caremark.

price discipline in) the Medicaid market. As such, the market for the provision of PBM services for private insurance is a different market from that for the governmental market.

34.     Through its relationship with Blue Cross Blue Shield of Louisiana, Inc., (and its affiliate HMO Louisiana, Inc.) ESI is far and away the dominant market player, with approximately 80.33% of the private PBM market in 2023 in Louisiana.[7]

35.     ESI's enormous market power allows them to decide what drugs pharmacies will receive reimbursements for on behalf of patients, and the reimbursement rates. On information and belief, ESI does this without disclosing how much they charge and how much they earn through their opaque role in the drug reimbursement process.

36.     ESI's market power also allows them to impose crippling fees on independent pharmacies, which can severely decrease the effective reimbursement rates, and thus the financial viability of independent pharmacies.

37.     Independent pharmacies generally cannot decline to deal with Express Scripts because of its control of access to over 80% of the Louisiana private market. The greater the number of plan members that a PBM represents, the greater its market power. Independent pharmacies have no realistic option other than to accept Express Scripts' terms because they cannot reasonably operate if they are cut off from such a large segment of potential customers.

38.     ESI's market power is further cemented by the fact that pharmacy customers are locked into their health insurance plans. By the time a customer arrives at a pharmacy counter to obtain prescription drugs, the PBM that will process that transaction is set. The claim is processed through the ESI automatically. Neither the consumer nor the pharmacy has the option to switch to a different PBM to seek better reimbursement rates or lower fees from a different PBM.

39.     A pharmacy can hypothetically refuse to contract with ESI, but the predictable result is that customers compelled to use ESI's network will be forced to take their prescription drug business to other pharmacies.

40.     ESI, like other PBMs, charges pharmacies various types of Direct and Indirect Remuneration (DIR) fees. These fees are often applied retroactively and are imposed in various types, as further described in the following paragraphs.

---

[7] Louisiana Department of Insurance, located at https://www.ldi.la.gov/onlineservices/TopTwentyPremiums/

41. Performance-Based DIR Fees: On information and belief, these fees are tied to specific performance metrics set by ESI. ESI audits pharmacies for medication adherence rates, generic dispensing rates, and other clinical outcomes. If a pharmacy fails to meet these metrics, ESI may charge higher DIR fees. This type of fee is nominally intended to incentivize pharmacies to improve their performance but in effect is financially burdensome, especially for pharmacies serving complex patient populations.

42. Clawback Fees: On information and belief, clawback fees are a form of retroactive charge where ESI recoups a portion of the reimbursement paid to pharmacies after the point of sale. These fees are typically calculated based on the total cost of the drugs dispensed or specific contractual agreements. Clawbacks create financial uncertainty for pharmacies as they cannot predict their final reimbursement amounts at the time of sale. They frequently result in forcing pharmacies, especially independent pharmacies, to incur a net loss for each unit dispensed to a consumer. These fees, however, are not passed on to the consumer in the form of price reductions.

43. Fixed or Variable DIR Fees: On information and belief, some DIR fees charged by ESI are fixed amounts per prescription, while others vary based on the cost of the medication or other factors. These fees can be applied uniformly or tiered based on different thresholds and performance targets. The variability and complexity of these fees can make it difficult for pharmacies to manage their finances effectively, and again frequently result in forcing (independent) to operate at a net loss. These fees, however, are not passed on to the consumer in the form of price reductions.

44. Rebate-Based DIR Fees: On information and belief, ESI may also charge DIR fees based on the rebates they negotiate with drug manufacturers. These savings occasioned by these rebates are not passed on to the pharmacies or patients. Instead, the rebates contribute to the ESI's revenue, and the associated DIR fees are deducted from the pharmacies' reimbursements.

45. Administrative Fees: In addition to performance-based and rebate-related fees, ESI may charge pharmacies administrative fees that cover the cost of managing pharmacy networks and processing claims. These fees can further reduce the net reimbursement that pharmacies receive, adding to their financial burden and operating losses.

46. Contracts between ESI and pharmacies are highly complex and opaque, making it difficult – and often impossible – for pharmacies to fully understand the terms. This complexity can include the convoluted reimbursement formulas, various fees, and performance metrics,

discussed above. In addition, independent pharmacies do not even have access to the complete terms of their contracts with ESI.

47. Independent pharmacies also typically operate on small margins. As a result, they are disproportionately affected by DIR fees compared to large chain pharmacies. Unlike the "big box" retail-chain pharmacies, independent pharmacies do not have bargaining power to negotiate terms with PBMs.

48. On information and belief, ESI uses its market power to reimburse independent pharmacies on a net basis less than chain pharmacies or their affiliates for the same drugs.

49. On information and belief, ESI uses its market power to reimburse independent pharmacies on a net basis less than it reimburses its affiliates for providing the same services.

50. On information and belief, ESI provides limited information to independent pharmacies about how DIR fees are calculated and applied.

51. The structure of DIR fees imposed by ESI incentivizes higher list prices for drugs. On information and belief, Express Scripts negotiates discounts and rebates based on the list prices, but Express Scripts retains these rebates, causing the final cost to the payer and patient to remain high.

52. On information and belief, ESI recategorizes large portions of these rebates, changing the name from "rebate" to some form of "fee," in order to maintain the illusion that "rebates" are all passed on to the consumer.

53. On information and belief, the result is that ESI often reimburses pharmacies at a net rate (post adjustments) that are below the pharmacies' cost of acquiring the medications. This practice puts significant financial pressure on pharmacies, particularly independents, which may not have the negotiating power to secure better terms.

54. According to the Louisiana Association of Independent Pharmacies ("LIPA"), more than 100 pharmacies closed in Louisiana in 2023.

55. On information and belief, ESI often enters exclusive contracts with large pharmacy chains, limiting the ability of independent pharmacies to join networks. This restricts patient choice and can lead to higher costs for those who are forced to use out-of-network pharmacies. Additionally, these exclusive arrangements often mean patients have fewer options for accessing medications, particularly in underserved or rural areas.

56. On information and belief, ESI also engages in spread pricing, wherein ESI negotiates prices with pharmacies and separately negotiates prices with health insurers. For example, if ESI pays a pharmacy $50 for a prescription but charges a health plan $70 for the same prescription, the $20 difference is the spread that Express Scripts retains as profit. This model allows ESI to generate significant revenue by leveraging its negotiation power with both pharmacies and client.

57. On information and belief, ESI often threatens to remove independent pharmacies from their network, or otherwise retaliates or penalizes independent pharmacies, based on a pharmacy's inability to afford to fill certain prescriptions, even if that pharmacy would have to sell the prescription at a net loss. This is a further instance of ESI using its market power to unfair and anticompetitive ends.

### C. ESI's rebate system causes drugs to cost more than they would in a properly functioning competitive market.

58. Manufacturers generally agree to reduce prices on brand-name medications through contracts with PBMs called rebate agreements.

59. PBMs often design, create, and maintain formularies for employers or health plan sponsors with which they contract as a part of the PBM Services they agree to provide. A PBM's national or default formulary has a large degree of clout in determining which drugs are generally covered.

60. Drugs appearing on a PBM's formulary generally have a lower co-pay than those not on the formulary, which drives patients to preferred drugs.

61. The Big Three strongly influence which drugs are offered on formularies and how much consumers and health insurers pay for the drugs. ESI requires manufacturers—as a condition of having their drugs on the ESI formulary—to pay administrative fees and rebates, which are usually calculated with the manufacturer's list price as a part of the equation.[8]

62. In negotiations with manufacturers, ESI may, and on information and belief has, threatened to exclude drugs from formularies unless ESI receives demanded fees and rebates.

63. Express Scripts' use of outright formulary exclusion has accelerated rapidly in recent years. From 2014 to 2022, the number of brand drugs excluded from its formularies increased 888%,

---

[8] A drug manufacturer's "list price," also known as the Wholesale Acquisition Cost (WAC), is the price set by the pharmaceutical company for a drug before any discounts, rebates, or other price adjustments.

from 57 to 563. Express Scripts' exclusionary tactics force manufacturers to compete to enter the market in the first place, according to rules set by ESI, rather than compete in the market for patients, according to patient needs and preferences. This market power allows ESI to extract massive rebates from manufacturers fearful of exclusion and even larger rebates from manufacturers seeking to exclude competitors.

64.     ESI and other PBMs generally pass on most of these rebates to employers and/or the customers of the health insurers who own the PBMs. However, PBMs, and on information and belief including ESI, generally retain a portion of rebates for themselves.

65.     Given its market power, the Big Three PBMs, including ESI, have over time negotiated for larger and larger discounts in the form of amended rebate agreements. On information and belief, this demand for greater discounts has caused drug companies to increase pre-rebate prices.

66.     Therefore, while the Big Three PBMS, including ESI, often claim to be responsible for lower drug prices through their ability to get rebates, their practices cause the pre-rebate price of the drugs to increase.

67.     In many health insurance plans, the co-pays for drugs are set as a percentage of the pre-rebate costs of the drug. When the pre-rebate cost increases, so does the amount the privately insured person pays out-of-pocket.

68.     If ESI were to use its market power to secure the best combination of low cost and high efficacy for employers and plan sponsors, the result would be an example of the proper functioning of a competitive market. But ESI leverages its power to conceal information about its relationships with manufacturers, thus insulating itself from the competitive pressures that would result if employers were able to assess accurately the true quality-adjusted price of its services.

### D. ESI uses its market power to require patients to pay for brand name drugs rather than cheaper generics.

69.     Generic drugs play an important role in providing affordable health care to patients by providing cheaper, effective alternatives to brand-name drugs. There is a significant public interest, therefore, in avoiding delays in the adoption of effective generic alternatives by health plans.

70.     Historically, generics have been adopted at a rate of 80% or more within only a few months. In 2021, however, the top 10 new generics averaged 70% market share of total prescriptions. This slower adoption is a result of PBM influence. Due to the Rebates system,

PBMs, including ESI, are incentivized to prefer higher-priced brand name drugs over their more affordable generic counterparts.

71. In 2016, first generics — the first approval that allows a manufacturer to market a generic drug in the United States — were covered only 46% of the time. Those drugs reached 90% coverage in 2022, six years after they first came to market. These delays restrict patient access to lower-priced generics and expose patients to unnecessarily high cost-sharing.

72. Because brand name drugs come with greater rebates, and ESI retains a portion of those rebates as discussed above, on information and belief, a regular practice of ESI has been to only include the branded drug in its formulary. On information and belief ESI implements have "do not substitute" or "DNS" strategies that prevent consumers from obtaining low-cost generics.

73. In this manner, ESI retains profits it would otherwise lose from including cheaper generic alternatives on its formulary.

74. These large rebates for branded drugs enrich ESI, but impoverishes the privately insured patients, who must pay out-of-pocket. The privately insured patients get no benefits from the rebates, because their co-pays are based on the pre-rebate price of the drug.

75. Often even the heavily discounted post-rebate price of a branded medication will be higher than generic alternatives.

**E. Group purchasing organizations impose fees on drug manufacturers that result in higher prices for patients.**

76. Since 2018, out of pressure from employers to receive a greater percentage of rebates, and out of fear that rebates could be classified as illegal kickbacks, the Big Three PBMs implemented a new innovation: group purchasing organizations ("GPOs").

77. GPOs are subsidiaries of PBM that negotiate rebates with drug manufacturers. The main feature of GPOs is that they impose fees on manufacturers. These fees amount to billions per year. From 2018 to 2022 fees by drug manufacturers to GPOs increased from $3.8 billion to $7.6 billion.

78. Because these fees are (1) not "rebates" and (2) imposed by a subsidiary and not the PBM itself, PBMs are not obligated to share any portion of these fees with employers.

79. The greater the fees imposed by GPOs, the less manufacturers offer in rebates. A PBM can retain all the GPOs' fees, and while passing on all of the reduced rebates to the employers. This creates the illusion that GPOs reduce drug prices.

80. On information and belief, the fees imposed on manufacturers by GPOs require the manufacturers to further increase pre-rebate prices, resulting in further harm to the privately insured patient paying drug co-pays.

### F. ESI, Prime Therapeutics, and Humana use a GPO, Ascent, to share information and harmonize rebates and fees, leading to coordinated drug price increases.

81. ESI is the PBM for Blue Cross and Blue Shield of Louisiana (including Blue Cross LA and Blue Advantage), which are all health insurance products of Louisiana Health Service and Indemnity Company, Inc.

82. Prime Therapeutics LLC is a PBM collectively owned by 19 Blue Cross and Blue Shield (BCBS) plans, as well as subsidiaries or affiliates of those plans. Prime holds approximately 6% of the national PBM market, spending approximately $36.7 billion on drugs in 2022.

83. BCBS Nebraska and BCBS Minnesota created Prime in 1998, and more plans joined as co-owners. On information and belief, Blue Cross Blue Shield of Louisiana (Louisiana Health Service and Indemnity Company, Inc.) is one of the 19 owners of Prime Therapeutics LLC.

84. Ascent Health Solutions, LLC was formed in December 2005 through the merger of Alliance Medical Corporation and Vanguard Medical Concepts—two leading companies in the reprocessing and remanufacturing of medical devices.

85. In 2019, Ascent's operations expanded significantly when Express Scripts and Prime Therapeutics both moved their rebate contracting to Ascent. This consolidation allowed Ascent to manage rebates for millions more insured patients, enhancing its negotiating leverage with drug manufacturers, and allowing ESI and Prime Therapeutics to shield their rebate systems from potential regulatory action. To further shield its activities, Ascent moved portions of its operation to Switzerland.

86. In November 2019, ESI assigned its commercial rebate agreement with at least one major drug manufacturer to Ascent.

87. On December 19, 2019, Prime Therapeutics, ESI, and Ascent announced a "three-year collaboration" to intensify pressure on manufacturers to pay even greater rebates or fees. On information and belief, the collaboration agreement contemplates indefinite extensions of the three-year collaboration. On information and belief, the terms of this collaboration provide that rebate negotiations with manufacturers by ESI and Prime are handled jointly by Ascent.

88. On information and belief, Ascent rebate agreements contain substantially the same structure and terms as those of ESI: (1) Ascent receives administrative fees and rebates paid by

manufacturers that are calculated as a percentage of list price. (2) Rebate amounts depend upon a product's formulary status, and formulary eligibility and status depend upon a manufacturer's rebate bid. (3) Ascent protects its rebates and margins by requiring manufacturers to sign inflation agreements or provide inflation guarantees that ensure Ascent — and by extension, the PBMs — is shielded from rising prices. (4) Ascent requires parties to agree to broad confidentiality provisions that extend to wide categories of information, including the terms of the Rebate agreement and even the existence of the agreement itself.

89. ESI and Prime also used Ascent to align their drug prices, rebates, fees, and retail pharmacy reimbursements.

90. Ascent also provides services to Humana Pharmacy Solutions, Inc., another PBM with significant operations in Louisiana. Ascent began providing services to Humana starting April 1, 2019.

91. On information and belief, ESI and Humana Pharmacy Solutions used Ascent to share drug pricing and rebate information. With this information, ESI and Humana Pharmacy Solutions acted in collusion in negotiating rebates and prices. This collusion allowed these PBMs to fix prices and increase the costs of medications, thereby driving up drug prices and ultimately pushing higher costs onto patients.

92. In 2021, Prime Therapeutics President and CEO Ken Paulus, stated publicly in an interview with Managed Healthcare Executive: "We were 15% behind the marketplace on cost of goods sold, easily, maybe more. So we needed a crystallizing event. This [the formation of Ascent] definitely served as that event." Moreover, Paulus made clear that the formation of Ascent allowed Prime to harmonize its prices and terms with those of its rival ESI with respect to both manufacturers and pharmacies, explaining: "Cost of goods sold is broken into two pieces. It's the rebates in pharmacy and buying medications and its pharmacy dispensing and the networks, if you will. We were off on both of those."

93. Paulus's statements in that interview leave little doubt that a significant purpose of the collaboration with ESI was to depress reimbursement rates paid to pharmacies and to increase the administrative fees charged to those pharmacies by Prime Therapeutics. He stated that Prime Therapeutics was ". . .the highest paying retail pharmacy network pharmacy payer in the marketplace. We realized, wow, we probably need to sharpen our pencil there a little bit."

94. These facts demonstrate ESI, in collaboration with Prime and Humana, have formed a monopoly in restraint of trade.

## V. Probable Violations of Law

*Count 1: Louisiana Monopolies Act Against All Defendants*

95. The State incorporates by reference the allegations contained in preceding paragraphs of this Petition as though fully set forth herein.

96. ESI exercises its power to restrain and prevent competition for PBM services and pharmacy services, thus harming all Louisiana citizens who must pay out-of-pocket co-pays for prescription drugs.

97. Beginning at least as early as December 2019 and continuing in some cases through the present, the Defendants Express Scripts, Prime Therapeutics, Humana Pharmacy Solutions, Humana, and Ascent have engaged in a combination of capital, skill, or acts to create or carry out restrictions in trade or commerce or to fix, harmonize, and raise prices of numerous drugs.

98. Defendants' combinations had the purpose of creating or carrying out restrictions in trade or commerce for the purpose of establishing the List Price of such drugs so as to preclude free competition in the sale of these drugs.

99. Defendants' combination also allows them to exclude from their formularies the drugs of manufacturers that refuse to increase the rebates, fees or "value" paid to Defendants, and to increase the list prices of their drugs.

100. The collusive conduct of ESI, Prime Therapeutics, Humana Pharmacy Solutions, Humana, and Ascent described herein has denied Louisiana patients the benefits of free and unrestricted competition in the marketplace by suppressing the information that would allow meaningful comparisons among competing PBMs, and by forming and carrying out agreements with manufacturers that have the purpose and effect of fixing and increasing the out-of-pocket prices patients must pay, and denying access to the most efficacious and best-in-class medications.

101. Express Scripts, Cigna, and Evernorth have realized supracompetitive profits as a result of their restraint of trade.

102. Express Scripts, Cigna, and Evernorth have profited as a direct result of the increased rebates pharmaceutical manufacturers are required to pay under agreements with Defendant Ascent, resulting in supracompetitive list prices for brand name pharmaceuticals.

103. This conduct is ongoing and is likely to continue without an injunction.

*Count 2: Louisiana Unfair Trade Practices Act Against ESI*

104. The State incorporates by reference the allegations contained in preceding paragraphs of this Petition as though fully set forth herein.

105. ESI's business practices with the independent pharmacies of Louisiana are unfair, deceptive, unscrupulous, contrary to public policy, and substantially injurious to the public, in violation of La. R.S. 51:1401 et seq.

106. Specifically, ESI's abuse of its enormous market power to impose unethical, unscrupulous, and exorbitantly high fees on independent pharmacies—under threat of being expelled from the ESI network—amounts to an unfair trade practice.

107. ESI's abuse of its enormous market power to impose unethical, unscrupulous, and exorbitantly low reimbursement rates on independent pharmacies—under threat of being expelled from the ESI network—amounts to an unfair trade practice.

108. ESI's abuse of its enormous market power to engage in covert spread pricing to further enrich itself at the expense of the independent pharmacies in its network amounts to an unfair trade practice. The Louisiana Unfair Trade Practices Act is expressly applicable to spread pricing pursuant to La. R.S. 22:1867(C) and 40:2870(4).

109. ESI's retaliation against independent pharmacies that decline to fill prescriptions based on contractual reimbursement rates also amounts to an express violation of the Louisiana Unfair Trade Practices Act, made applicable through La. R.S. 22:1860.3

110. ESI's unfair trade practices as described herein are ongoing within Louisiana, and is likely to continue without an injunction.

*Count 3: Unjust Enrichment Against All Defendants*

111. Alternatively, in the event the State has no remedy at law against the Defendants herein, the State maintains this action under the principles of unjust enrichment, pursuant to La. Civil Code Article 2298.

112. As a result of the conduct described in this Complaint, Defendants ESI, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, Humana, and Ascent have received certain funds to which they were not entitled.

113. By their acts described in this Complaint, Defendants Ascent, Express Scripts, Prime Therapeutics, Cigna, Evernorth, Humana Pharmacy Solutions, and Humana have been unjustly enriched at the expense of uninsured and underinsured consumers in Louisiana, as well

as at the expense of Louisiana consumers whose out-of-pocket expenditures for prescription drugs are calculated based on manufacturers' list prices.

114. Defendants are bound to compensate the consumers of Louisiana to the extent that the Defendants have been unjustly enriched.

## VI. Relief Requested

115. The State of Louisiana requires production of all data related to pharmaceutical pricing, rebates, fees, pharmacy network agreements, transactions with Louisiana Pharmacies, benefits paid or denied to Louisiana citizens, and all other information pertaining to the conspiracies and conduct described in this Petition.

116. As a regular business practice, the Defendants conceal the information the State requires to determine with certainty the facts upon which it may bring civil actions at law and equity against the Defendants. The State can only obtain this information by examination of the defendant and other persons under oath and from inspection of documents, including books, records, accounts and papers relating to the subject matter in the possession or control of the defendant or other persons.

117. The State has made written demand on the Defendants for a full disclosure of the information which they have with respect to the conspiracy and conduct described herein to no avail: the demand has been refused or has not been complied with within a reasonable time or has been complied with only in part or so evasively that the plaintiff is still not sufficiently informed.

118. WHEREFORE, the State prays that it be authorized to proceed in the action for discovery and investigation of all matters and things relating to the contract, transaction or acts described in the petition, and that the defendant be served with notice and a certified copy of the petition and the order thereon.

RESPECTFULLY SUBMITTED:

Elizabeth B. Murrill
Attorney General of Louisiana

Michael Dupree LBN 26870
Michael Charles Guy LBN 25406
Matthew Stafford LBN 32706
Paolo Messina LBN 26422
John Kelly LBN 35506
1885 North 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6498

PLEASE SERVE:

Express Scripts, Inc.
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

Express Scripts Administrators, LLC
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

Express Scripts Pharmacy, Inc.
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

Medco Health Solutions, Inc.
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

Accredo Health Group, Inc.
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

The Cigna Group
PURSUANT TO LONG ARM
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Evernorth Health, Inc.
PURSUANT TO LONG ARM
C T Corporation System
120 S Central Ave
Clayton, MO 63105